MATTER OF CANTU

In Deportation Proceedings

A-20554647

*Decided by Board October 19, 1978*
*Decided by Attorney General December 18, 1978*

(1) There is no basis in the legislative history or judicial construction of the Citizenship Clause of the Fourteenth Amendment to the United States Constitution for the view that territory of which the United States is the sovereign can be deemed removed from its jurisdiction for purpose of the Citizenship Clause.

(2) It is the presence within and the personal relationship to the United States of a newborn child's parents that determines whether he was born "subject to the jurisdiction [of the United States]" and without more became a citizen.

(3) Since the birth of the respondent occurred in territory of which the United States was then the sovereign, since the birth occurred prior to the territory being transferred to Mexico, and since the respondent's parents did not fall within any of the exceptions to the rule of jus soli noted in *United States* v. *Wong Kim Ark,* 169 U.S. 649 (1898), the respondent became a citizen of this country at the moment of his birth.

CHARGE:
Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant—remained longer than permitted

ON BEHALF OF RESPONDENT:
Laurier B. McDonald, Esquire
600 South Closner Avenue
P.O. Drawer 54
Edinburg, Texas 78539

ON BEHALF OF SERVICE:
George Indelicato
Appellate Trial Attorney

**BEFORE THE BOARD**
(October 19, 1978)

BY: Milhollan, Chairman; Appleman, and Farb, Board Members. Dissenting Opinion, Maniatis, and Maguire, Board Members

This case is before us upon certification by an immigration judge, who found the respondent deportable under the above charge.
The respondent is a 42-year-old male who was admitted to the

United States at Hidalgo, Texas, on May 12, 1972, as a temporary visitor alien for 3 days. It is conceded that he has remained longer than authorized. If alienage has been established, then he is clearly deportable as charged.

The pertinent facts are set forth in part in an oral stipulation made to the immigration judge.[1] The respondent was born in an area known as the "Horcon Tract," at the Texas-Mexico boundary, on August 25, 1935, to parents who were both natives and citizens of Mexico.[2] That portion of the "Horcon Tract" in which he was born is now part of the township of Rio Rico, Tamaulipas, Mexico. Geographically the "Horcon Tract" is in the lower half of a reverse S curve of the Rio Grande River, the international boundary between the United States and Mexico. For purposes of this case the upper half of the S curve was always Mexican territory and the lower half originally was part of the United States (see Map, Ex. 2 Appendix I). In 1906, the Rio Grande Land and Irrigation Company, a private concern, unlawfully changed the course of the river by making a cut-off to prevent the river from changing its course naturally so as to adversely affect the company's irrigation activities. The diversion had the effect of cutting off the lower half of the S curve, thus placing the "Horcon Tract" on the Mexican side of the river. (See Map Ex. 2 Appendix I). Thereafter, in the language of the stipulation, the United States "totally refrained from exercising jurisdiction over the aforesaid 'Horcon Tract'."

The International (Water) Boundary Commission found the company's action to be in violation of the Convention of 1884 between the United States and Mexico. It further found that the artificial diversion of the river did not change the preexisting boundary. In 1911, the United States, in combination with private Mexican citizens, instituted a suit in equity against the company, resulting in payment of penalty to the United States for its illegal action, and damages to the private parties for claims arising from the diversion.

It has been stipulated that the "Horcon Tract," notwithstanding the diversion, continued to be United States territory until the signing of a treaty between the United States and Mexico on November 23, 1970, designed to resolve pending boundary differences. Under the treaty, which became effective in 1972, the United States ceded the "Horcon Tract" to Mexico.

It has been further stipulated that the town of Rio Rico was founded

---

[1] A more definitive stipulation would have been helpful. However, the record is supplemented by exhibits which give a clearer picture.

[2] He thus acquired Mexican citizenship at birth under Article 40 of the Political constitution of Mexico of 1917, *Matter of Quintanilla-Montes*, 13 I&N Dec. 508 (BIA 1970). It is conceded by the Government that if he was a United States citizen at birth, he never expatriated. *See* Service Brief on Appeal, Page 4. He would thus be a dual national.

in 1929 in Tamaulipas, Mexico, wholly within the upper half of the S curve, in Mexican territory. Thereafter, as a result of floods that eroded the town, it gradually moved southward until by the 1940's it had crossed the abandoned bend of the Rio Grande and encroached into the "Horcon Tract" on the United States side of the river. Eventually about two-thirds of the town was in United States territory, and one-third still in Mexican territory.

From the time that the town of Rio Rico was established in 1929, it has had Mexican policemen on duty, the public schools are maintained by the Republic of Mexico or some political subdivision of it, such roads as there are, are maintained by Mexican authorities, and "the residents of the area abide by Mexican conscription laws which were in effect in their area" (Tr. p. 13). Births and deaths in the township were recorded, as in the case of the respondent, at the office of the Civil Registry at Matamoros, Mexico. The respondent himself complied with the conscription laws of Mexico. However, at the time the respondent was born in the "Horcon Tract," the town of Rio Rico had not yet expanded into that area where he was born, although the township later included the place of his birth.[3]

Lastly, it was stipulated at the hearing that the International Bridge between Thayer, Texas, across the Rio Grande, to the original location of Rio Rico, was carried away by a flood in 1941 and since then there has been no practical means of direct access between that part of Texas north of the river and the "Horcon Tract."[4]

The stipulated facts are corroborated and supplemented by an appendix to Exhibit 3, respondent's Brief below. The appendix is a scholarly treatise which appeared in the Rocky Mountain Social Science Journal, entitled *El Horcon: A United States-Mexican Boundary Anomaly*, by James E. Hill, Jr.[5] From it we learn that the court action instituted in 1911, occurred after the matter was reported to the Mexican Secretary of Foreign Affairs, and that the suit was by the United States Department of Justice, at the instigation of the United States Department of State. The bridge at Thayer, Texas, was built in 1929 and the town of Rio Rico was established at its south end. There was heavy traffic across the bridge during prohibition in the United

---

[3] *See* Tr. p. 23. This is according to a statement of counsel, made at the hearing during the oral stipulation, which was not opposed by the Immigration and Naturalization Service trial attorney, and which appears to be part of the stipulated facts.

[4] It will be noted that even prior to that, in the period between 1906 and 1941, to reach the Horcon Tract from the United States, it was necessary to proceed across the Mexican territory in the northern loop and to recross the abandoned bed of the Rio Grande River at its middle bend. The international line would actually be crossed twice.

[5] The exact date of publication is not set forth, but judging from the footnotes it was subsequent to 1965.

States, and a considerable influx of tourists was attracted by dog racing. As of the date of the article there was one official, a police inspector, and the police station, school, church, and plaza, all were located on United States soil, although the entire town was deemed within Tamaulipas, Mexico. Area residents had no knowledge of the presence of an international boundary line and only one monument marking the abandoned channel of the Rio Grande was still standing. The boundary was poorly delineated and even passed through some of the houses in Rio Rico. Officials in Hidalgo County, Texas, were not aware that the Horcon Tract was a part of the county. The county tax office taxed nothing south of the river, county law enforcement agencies had no jurisdiction in the area, and the county representative of the United States Department of Agriculture had no control over agricultural policies in the "Horcon Tract." A Mexican public road crossed the tract, one-quarter mile of it in United States territory.

Appendix 3 to Exhibit 2 is the Senate Report on the Treaty signed on November 23, 1970.[6] The Letter of Submittal from the Department of State to the President notes that under the convention of 1884 the "Horcon Tract" belonged to the United States, that a wilful and illegal relocation of the river took place in 1906, and that "In view of the exceptional origin and situation of the detached tract, the United States, at Federal, State, and local levels, has refrained from exercising jurisdiction over it." Article I F(2) of the treaty states that the "Horcon Tract" now under the sovereignty of the United States shall pass to and become part of the territory of Mexico." Article VI B states that the transfer "shall not affect in any way (1) the legal status with respect to citizenship laws, of those persons who are present or former residents of the portions of the territory transferred."

It is clear that the respondent's citizenship status must be determined in light of the law, and possibly, the facts, existing at the time of his birth in 1935 in the "Horcon Tract."

Respondent's claim to citizenship is founded on section 1 of the Fourteenth Amendment to the Constitution, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside," and section 1992 of the Revised Statutes, Act of April 9, 1866, 8 U.S.C. 1, section 1, 14 Stat. 27, "All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States."[7]

---

[6] It was ratified by the Senate on November 29, 1971, and entered in force on April 18, 1972.

[7] Section 1992 was repealed by section 504 of the Act of October 14, 1940 (54 Stat. 1173), which deleted the language "and not subject to any foreign power," and substituted "and subject to the jurisdiction thereof." The latter language was carried over into the

The Government concedes that the respondent was "born in the United States within the meaning of the Fourteenth Amendment." However, it challenges his assertion that he was also "subject to the jurisdiction thereof," the second prerequisite for United States citizenship at birth.

Before examining the meaning of these words it might be well to establish the burden of proof. This is a deportation proceeding. The overall burden is on the Government to prove its case by clear, convincing, and unequivocal evidence, *Woodby v. INS*, 385 U.S. 276 (1966). Alienage is jurisdictional. The respondent has denied alienage and has clearly established that he was born in United States territory. The burden of proving a defense would normally be on the one asserting the defense. Here, however, the respondent has not merely denied alienage, and asserted citizenship, he has proved he was born in this country. Since, with rare exceptions, persons born in United States territory are United States citizens at birth, it is clear that the burden is on the Government to show that he is in fact an alien. *Nishikawa v. Dulles*, 356 U.S. 129, 133, 2 L.Ed. 2d 659, 663 (1958).

As a corollary, the respondent does not have to establish that he is, beyond any challenge, a United States citizen. If the Government has not satisfactorily established alienage, that would end this deportation case. So far as this Board is concerned the task before us is solely to determine the outcome of this deportation proceeding. Either the Government has established, by the requisite burden of proof, that the respondent is an alien, or it has not; if it has not, it is not incumbent upon this Board to go the additional step of determining whether he is also a citizen. That determination can be left to some future date and some other process.

Section 1 of the Fourteenth Amendment, and more particularly the clause "subject to the jurisdiction thereof" has acquired some judicial gloss. In the Brief in Support of Respondent's Motion to Terminate the Proceedings, our attention has been directed to *United States v. Wong Kim Ark*, 169 U.S. 649 (1898) That case held that one born in San Francisco, of parents who were of Chinese descent and subject to the emperor of China although domiciled in the United States was a citizen of the United States and not excludable despite the fact that his employment would otherwise have brought him within the terms of the then existing Chinese exclusion laws. *The Schooner Exchange v.*

Immigration and Nationality Act of 1952. (8 U.S.C. 1401). The language "and not subject to any foreign power," appearing in section 1992 must be deemed to have the same meaning as "subject to the jurisdiction thereof" as it appears in the Fourteenth Amendment and in the later statutes. No judicial interpretation has been cited giving a different meaning, nor would it appear that any statutory act could diminish, lawfully, the constitutional definition.

*M'Faddon, et al.,* 7 Cranch 116, (1812), a case involving an attempted exercise of United States jurisdiction over a public vessel of a friendly sovereign power in a United States harbor. There Chief Justice Marshall enunciated the rule that territorial jurisdiction is exclusive in the sovereign. However, where another sovereign enters with consent and license, the dignity of the foreign sovereign and the object for which the license is granted may equally require that the one obtaining the license shall have full security, and an exemption may exist.

In *United States* v. *Rice,* 4 Wheat. 246, 4 L.Ed. 562 (1819) the exemption was extended to United States territory occupied by hostile enemy forces. The children of occupying enemy aliens have been held not born "subject to the jurisdiction" of the United States during such occupation, since at the time of birth they did not derive protection from, and consequently did not owe obedience or allegiance to the United States. *Inglis* v. *Sailor's Snug Harbor,* 28 U.S. (3 Pet.), 99, 145-188 (1830).

Similarly those born within the Indian tribes in the United States, owing allegiance to their tribes rather than to the United States Government according to practices dating from the founding of this country, under which they were deemed citizens of the United States only under explicit provisions of a treaty or statute to that effect, were not born "subject to the jurisdiction" of this country within the meaning of the first section of the Fourteenth Amendment—any more than the children born within the United States of ambassadors or other public ministers of foreign nations, *Elk* v. *Wilkins,* 112 U.S. 94, 28 L.Ed. 643 (1884). *Elk* v. *Wilkins* recognizes the possibility that other exemptions might be implied from future facts.

Unfortunately, none of the cases cited deal with the issue raised in this case. That the Fourteenth Amendment is a living organism which can accommodate itself to future courses of human behavior and embrace additional categories of exemption, as argued by the Government, is not unreasonable. Clearly, the United States can, under appropriate circumstances and by suitable means, expressly relinquish the exercise of sovereignty over a given area. Lastly, well established custom and usage, as in *Inglis* v. *Sailor's Snug Harbor,* and *Elk* v. *Wilkins, supra,* can also dictate recognition of an exemption.

However, the question of an implied relinquishment is a far different matter. Our attention has been directed to no law that permits a foreign Government to exercise exclusive jurisdiction over United States territory—and certainly to none applicable to the "Horcon Tract" prior to 1972. The accepted constitutional method to convey territory and with it to surrender, or acquire, jurisdiction, is by treaty ratified by the Senate, as occurred here. Can either the Federal executive, or the inhabitants of a part of the United States, unilaterally divest themselves of the duties and obligations stemming from United

195

States sovereignty over an entire area?[8] Surely this nation fought a terrible and bloody Civil War to prove the contrary.

The words "subject to the jurisdiction thereof," like the language "completely subject" and "owing allegiance" to the United States used in *Elk* v. *Wilkins, supra,* embody concepts which may exist independently of physical action. For example, it is conceivable that the United States Government may never have exercised jurisdiction over some remote area of the United States in Alaska, or in the Great Smoky Mountains, perhaps for lack of knowledge of its existence, or perhaps just because of remoteness and difficulty of access. It could hardly be argued on that basis alone, that that area was not "subject to the jurisdiction" of this Government. A more reasonable interpretation of the phrase "subject to the jurisdiction" is that it connotes a duty or obligation on the part of both Government and those domiciled in United States territory. On the one hand the Government owes the duty of protection, or the grant of benefits and rights available to other citizens, and on the other the citizen owes the duties which every citizen owes to this Government if and when he is called upon to perform them. That the debt may not have been called in, does not mean it does not exist. In essence this case poses the question whether a *non-exercise* of rights and duties on the part of either the Government or those domiciled in United States territory, if coupled with the performance of otherwise illegal acts by and for another sovereign, is enough in itself to bring about a change in citizenship.

Even if, arguendo, the answer is in the affirmative, still another question must be answered. At what point in time would "non-action" lead to a change in citizenship status? From 1884 on, the Horcon Tract was clearly a part of the United States. Whatever lack of attention was paid to this small and remote area prior to 1906, there is little question that those born in it were citizens of the United States before that year. Why then is there an issue as to their citizenship thereafter? It arises because there was a gradual usurpation, or acceptance (depending on the point of view), of local Mexican jurisdiction as a result of various accidents of local geography. This continued in various degrees over some 60 odd years.

However, the Mexican town of Rio Rico did not even come into existence until 1929. It was created on Mexican land, at the Mexican end of the then existing international bridge. It did not expand over the abandoned bend of the Rio Grande River into the United States "Horcon Tract" until land erosion forced its southward migration. But the respondent was born in the "Horcon Tract" in 1935. As of some

---

[8] One must distinguish here an individual's voluntary divestiture of citizenship *after* birth authorized by statute, *see Afroyim* v. *Rusk,* 387 U.S. 253 (1967).

later date, the part of the present town where the respondent was born had a Mexican police official, church, birth records, Mexican Army conscription, and even one-quarter of a mile of Mexican road—but there is nothing to indicate when all this came about.

As of the date that the respondent was born, the town did not yet include the place of his birth. It is most unlikely that all of these "indicia" of Mexican sovereignty would have shown themselves in the brief period between 1929, when the town was founded, in Mexico, and 1935, when the respondent was born. There is no showing that the United States Government even knew of these encroachments on its territory, or, if it did know, when it learned about them. It has not been shown that, having learned about them at a time prior to the respondent's birth, it acquiesced in them to the point of renouncing the *right* to assert its sovereignty.

Thus, apart from the very formidable legal obstacle of whether a non-acquisition of citizenship can be based on a circumstantial "implication" of renunciation of sovereignty, there is a lack of evidence establishing by the requisite burden of proof that there *was* any such "implied" renunciation or consent by the United States Government.

In summary, with respect to the crucial period in 1935 when this respondent was born, there had been neither a formal assumption of sovereignty by Mexico nor a formal renunciation of sovereignty by the United States. The Government case depends on an unauthorized assumption of authority by Mexico, allegedly impliedly recognized and acquiesced in by the United States Government, and constituting the equivalent of consent to exemption from sovereignty.[9] We have difficulty with this in the face of the clear assertion in the treaty that sovereignty was still in the United States. Nor does the language in the Department of State's Letter of Submittal of the treaty to the President, "in view of the exceptional origin and situation of the detached tract, the United States at Federal, State, and local levels, has refrained from exercising jurisdiction over it," dictate a contrary finding. The intimation is that jurisdiction was not exercised because of fear of causing an international incident or disturbing international harmony. One reading of this is that the United States, as late as 1970, felt that it could have exercised its rights of jurisdiction at any time had it chosen to, but that it was content to leave matters *in status quo.* To put the extreme—that this country would not have been disposed to go to war with Mexico because of encroachments within the "Horcon Tract"—does not necessarily warrant the conclusion that the United

---

[9] Somewhat paradoxically the Government is urging the loss of its sovereignty. One can readily envisage the United States taking a diametrically opposite position on a different set of facts.

States either deemed the encroachments legal, or had surrendered its *rights* of sovereignty. The question must be posed, if, as of 1935, the United States Government had demanded that those born and domiciled in the "Horcon Tract" pay taxes to this country, or otherwise perform the duties of citizenship, they could have legally and rightfully refused. By the same token, it has not been shown that if such a person had been conscripted into Mexico's army and refused to serve on the ground that he was a United States citizen, that he might not have been able to have this Government intervene in his behalf.[10]

It is not without significance in the overall consideration of this case that the renunciation of sovereignty, when it did occur, was part of a treaty between the United States and Mexico to resolve boundary differences and disputes, and further, that that treaty required the advice and consent, and, ultimately, the ratification of the Senate. All this was a futile exercise if our country had clearly relinquished, as far back as 1935, its rights of sovereignty.

Lastly, we do not see any failure to act by the United States Government officials creating an estoppel on the facts of this case, as urged by the respondent, nor do we view the respondent as estopped by reason of his inaction in asserting a right to citizenship. As to the former, the United States did not affirmatively act to mislead the respondent into a misconception of his position—*Hibi* v. *INS*, 414 U.S. 5 (1973); as to the latter, it would appear that there is at least a possibility that until recent date he had no knowledge of what rights he might have had as a citizen. Even assuming an outward failure to exercise jurisdiction, a fact which was stipulated, this does not mean the area was not "subject to the jurisdiction" of the United States for the reasons stated.

It is concluded that the Service has failed to establish alienage.

**ORDER:** It is ordered that the proceeding be terminated.

DISSENTING OPINION: Louis P. Maniatis, Board Member

I must respectfully dissent as I find that the respondent's deportability has been established by clear, convincing, and unequivocal evidence.

The sole issue before us is whether this respondent, by virtue of his birth in the Horcon Tract[1] on August 25, 1935, falls within the cate-

---

[10] That this respondent did serve is not significant. His service occurred after the date of his birth in 1935 and was not expatriative in effect, as conceded. In any event there is serious question whether he was not obligated to serve as a Mexican citizen at birth. *See* Note 2.

[1] The circumstances underlying the creation of the Horcon Tract in 1906 are set forth by the majority and need not be restated here. The history of this tract of land subsequent to 1906, however, will be further developed *infra*.

gory of persons declared to be citizens in section 1 of the Fourteenth Amendment to the Constitution of the United States. That section reads in relevant part:

"Section 1. All persons born ... in the United States, *and subject to the jurisdiction thereof*, are citizens of the United States and of the state wherein they reside." (Under scoring supplied.)[2]

If the respondent derived citizenship at birth under this section, then the deportation proceedings must clearly be terminated. If he did not, however, then it is equally clear (and the respondent so concedes) that he is deportable as charged.

The immigration judge found that the grant of citizenship in this section of the Fourteenth Amendment attaches only to those persons who are both born within United States territory and born subject to its jurisdiction. He concluded that although this respondent was born within United States territory, he did not derive citizenship thereby because he was not subject to the jurisdiction of this country at the time of his birth. He, therefore, found the respondent deportable as charged. I must concur with the immigration judge's conclusion.

The issue of the respondent's citizenship is most reasonably resolved by addressing three underlying questions. The first relates to the words "and subject to the jurisdiction thereof" in section 1 of the Fourteenth Amendment. Do these words of limitation refer only to the three categories of persons found not to acquire citizenship at common law even though born within the King's realm, as argued by the respondent, or are they sufficiently expansive to encompass other categories of persons not subject to the jurisdiction of this country at birth either because of the sovereign's choice or otherwise? Secondly, assuming the latter construction to be correct, are there circumstances under which the United States has the sovereign authority to remove from within its jurisdiction, expressly or impliedly, a particular tract of its own territory so as to defeat subsequent claims of citizenship by those born therein? Finally, assuming that the United States could do so, has it been established as a factual matter that prior to the respondent's birth, this country elected to waive its jurisdiction over the Horcon Tract.

I.  Construction of the words "... and subject to the jurisdiction thereof ..." in Section 1 of the Fourteenth Amendment

The respondent admits that the specification of citizenship in section 1 of the Fourteenth Amendment is founded on the dual requirement of

_____

[2] This Constitutional declaration of citizenship is incorporated in the Immigration and Nationality Act of 1952 at section 301(a)(1), 8 U.S.C. 1401(a)(1).

birth within United States territory and birth "subject to the jurisdiction thereof." He maintains, however, that these cited words of limitation were placed in the Fourteenth Amendment only so as to incorporate an exclusion of three *fixed* categories of persons who were denied jus soli citizenship at common law even though born within the territory of the sovereign (*i.e.*, children born of diplomatic representatives of a foreign state; children born of alien enemies in hostile occupation; and, children born of aliens on foreign warships in the sovereign's domain). The respondent submits that the words "and subject to the jurisdiction thereof" were used simply as an abbreviated method of excluding from jus soli citizenship these three, and only these three, categories of persons. I find this construction overly restrictive, however, in view of the common law origins of these words and their subsequent interpretation by judicial authorities.

Justice Story ably summarized the common law principles underlying the acquisition of jus soli citizenship in his separate opinion in *Inglis* v. *Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 145-188 (1830), wherein he stated:

> The rule commonly laid down in the books is that every person who is born within the ligeance of a sovereign is a subject; and, e converso, that every person born without such allegiance is an alien. This, however, is little more than a mere definition of terms, and affords no light to guide us in the inquiry what constitutes allegiance, and who shall be said to be born within the allegiance of a particular sovereign; or, in other words, what are the facts and circumstances from which the law deduces the conclusion of citizenship or alienage. Now, allegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign. Two things usually concur to create citizenship; first, birth locally within the dominions of the sovereign; and second, birth within the protection and obedience, or in other words, within the ligeance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and, consequently, owe obedience or allegiance to, the sovereign, as such, de facto.

*Inglis* at 155. Meeting the dual requirements of birth within the sovereign's dominions and birth subject to his jurisdiction was necessary for

> though at common-law nationality or allegiance in substance depended upon the place of a person's birth, it in theory at least depended, not upon the locality of a man's birth, but upon his being born within the jurisdiction and allegiance of the King of England....[3]

It was generally true of course that one born within the sovereign's territory was concomitantly born subject to his jurisdiction. Certain exceptions (those cited by respondent) did arise. Those exceptions,

---

[3] Dicey, *Digest of the Law of England with Reference to the Conflict of Laws* (1896), as cited in *United States* v. *Wong Kim Ark*, 169 U.S. 649, 658 (1897).

however, served to "illustrate and confirm"[4] the general doctrine that birth within the King's realm did not by itself guarantee the acquisition of British citizenship.

It was this general common-law doctrine that was incorporated into the Constitution by the framers of the Fourteenth Amendment. The fact that the Fourteenth Amendment incorporated the doctrine itself (rather than just the three common-law exceptions thereto) is readily apparent from an early Supreme Court interpretation of the language of that Amendment. In *Elk* v. *Wilkins,* 112 U.S. 94 (1884) the Court, applying the common-law doctrine that birth within the realm alone did not insure citizenship, found an additional category of persons who, though born within United States territory, did not acquire jus soli citizenship because they were not born "completely subject to (the) political jurisdiction (of the United States) and owing them direct and immediate allegiance."[5] This decision clearly could not have been reached if only those three categories of persons denied jus soli citizenship at common law could be denied such citizenship under the Fourteenth Amendment. The *Elk* decision precludes a finding that the language of that Amendment is as restrictive as urged by respondent and directs instead an interpretation which incorporates into the Constitution the common-law *doctrines* underlying acquisition of jus soli citizenship.

The respondent cites in support of his position a Supreme Court decision, occurring 14 years after *Elk,* namely, *United States* v. *Wong Kim Ark, supra.* In *Wong Kim Ark,* 169 U.S. at 682, Justice Gray wrote for the majority:

> The real object of the 14th Amendment of the Constitution, in qualifying the words, 'all persons born in the United States,' by the addition, 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases—children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state—both of which, as has already been shown by the law of England, and by our own law, from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country.

This language, however, must be read in the context of the issue then before the Court wherein it was asserted that the limiting words of the Fourteenth Amendment should be interpreted to exclude from United States citizenship categories of persons who were born in a place where

[4] *Inglis* v. *Sailor's Snug Harbor, supra* at 155.

[5] In *Elk,* the court rejected the citizenship claim of an American Indian who was born within the United States and subsequent to birth "surrendered" himself to its jurisdiction. Later events negated the effect of this decision but not its rationale.

the United States was in full exercise of its jurisdiction and who would not have been denied citizenship under the general common-law doctrines discussed above.[6] The Court rejected this position. Within this context, Justice Story's opinion is appropriately read as affirming that the common law *doctrines* regarding the acquisition of jus soli citizenship were incorporated into the Constitution by the Fourteenth Amendment but that no expansion of those doctrines was intended by the framers of that Amendment. The Court's reference in *Wong Kim Ark* to *Elk* v. *Wilkins, supra,* supports a conclusion that the quoted words cannot be read as a statement that only those exceptions to the general doctrines arising at common law were incorporated into the Constitution. Instead, it was acknowledged that other circumstances "unknown to the common law" might arise where persons would be born within the territory of the United States without acquiring its citizenship.

I conclude, therefore, that the words "and subject to the jurisdiction thereof" in the Fourteenth Amendment cannot be interpreted as restrictively as the respondent urges but must instead be read as incorporating into the Constitution the general doctrines under which one could acquire jus soli citizenship at common law. Thus, the question must be addressed of whether the United States has the sovereign power to remove an area of its territory from within its jurisdiction so as to defeat a claim of jus soli citizenship by one subsequently born within that territory.

## II. Sovereign's Authority to Withhold the Exercise of Jurisdiction over an Area of its Territory

The right of the United States to withhold its jurisdiction over a tract of its territory was initially raised in the respondent's brief before the immigration judge wherein he asserted that the United States engaged in "affirmative misconduct" when it refused to exercise jurisdiction over the Horcon Tract. "Indeed," it was submitted, "the failure of the Federal Government to exercise its functions of political jurisdiction within the Horcon Tract has been a serious breach of duty on the part of the government, and (the) Respondent ... certainly should not be penalized ... because of the government's refusal to exercise jurisdiction within the Horcon Tract since the year 1906." Such argument perforce assumes that the United States has no legitimate authority to restrict its jurisdiction over an area of its territory. I

---

[6] As Chief Justice Marshall noted in *Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 399 (1821):

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.

cannot concur in this underlying assumption.

The principles which control here were enunciated by Chief Justice Marshall in 1812 in what has been called "the great case of *The Exchange*."[7] He stated there in that:

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.
>
> All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.
>
> This consent may be either express or implied. In the latter case, it is less determinate, exposed more to the uncertainties of construction; but, if understood, not less obligatory.
>
> The world being composed of distinct sovereignties, possessing equal rights and equal independence, whose mutual benefit is promoted by intercourse with each other, and by an interchange of those good offices which humanity dictates and its wants require, all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers.

In applying these general principles to the facts before it, the Court in *The Exchange* concluded that the United States had impliedly agreed that foreign armed vessels which entered its ports in peace would be "exempt from the jurisdiction of this country." The United States retained the ultimate sovereign power to destroy this exemption, but while it existed no jurisdiction over such vessels could be said to remain with the sovereign. From this exemption in turn arose the fact that children born abroad such vessels, even while within United States territory, are not considered to be born in a place subject to the jurisdiction of this nation and, hence, acquire no jus soli citizenship.

These underlying principles[8] apply with equal force where the United States desires for reasons of international relations[9] to withhold the exercise of its jurisdiction over a small area of its territory which through unusual circumstances no longer falls within its natural international border. Thus, contrary to the majority, I find

---

[7] *The Schooner Exchange* v. *M'Faddon*, 11 U.S. (7 Cranch.) 116, 136 (1812).

[8] These principles relate solely to the authority of a *sovereign nation* to withhold the exercise of complete and absolute jurisdiction within its territories. They are directly *contra* to the premise (and it is certainly not submitted by the immigration judge or herein) that any corresponding right exists with *inhibitants* of a territory to "unilaterally divest themselves of the duties and obligations (to the sovereign)." Majority at page 8.

[9] The respondent, through counsel, submits that the refusal to exercise jurisdiction by the United States resulted from the "fear of causing an international riff" and the "fear of disturbing the international harmony with Mexico." Brief before the immigration judge at 7.

that the United States does not have the legitimate sovereign authority to restrict its jurisdiction in such a manner. The issue is not merely whether jurisdiction has in fact been exercised over a given place (*e.g.,* a "remote area of the United States in Alaska ... or in the Great Smoky Mountains."[10]) as circumstances could arise where the failure to act was unintentional and no diminution of jurisdictional control was contemplated. Instead, the determinative question must be whether the United States (either expressly or impliedly) during the relevant time period intentionally elected to divest itself of its jurisdiction over a designated area. If such an election was made, then I would conclude that persons born therein (just as those born on foreign warships or born to foreign diplomats) could not be said to be born "subject to the jurisdiction (of the United States)" within the meaning of those words in section 1 of the Fourteenth Amendment. Thus, I find that the question must be addressed whether the United States intended to, and in fact did, divest itself of its jurisdictional control over the Horcon Tract prior to this respondent's birth in 1935.

### III. Exercise of Jurisdiction by the United States over the Horcon Tract

I find that the evidence overwhelmingly establishes that the United States had elected to withhold its jurisdiction over the Horcon Tract at the time of this respondent's birth.[11] In this regard, one need look no further than the stipulations of the parties[12] and the respondent's brief

---

[10] Majority opinion at page 8.

[11] The majority's discussion of the factual issues is premised on the erroneous conclusion that the Government case depends on a showing that the United States surrendered its "*rights* of sovereignty" over the Horcon Tract to Mexico prior to the respondent's birth. The majority finds that such a showing was not made because the 1970 treaty indicates that sovereignty was transferred therein and because that treaty would have been a "futile exercise" if the "rights of sovereignty" had already been relinquished. They further pose the question: Could the United States have reaffirmed its jurisdictional control over the tract prior to the respondent's birth?

This analysis confuses the *ultimate* power of a nation to exercise full and complete jurisdiction within its territory with its coexisting power to consent to a relaxation *in practice* of that absolute and complete jurisdiction. It is not submitted that the ultimate "right of sovereignty" was transferred to Mexico before the effective date of the 1970 treaty. Until that treaty transferred sovereignty over the tract, the United States could have reasserted its jurisdiction control (just as this country retains the ultimate right to "destroy" the implied restriction on jurisdiction over foreign warships within its waters). *See The Schooner Exchange, supra* at 146. During the period when *jurisdictional control* is voluntarily relinquished, however, persons born within such an area (whether on a tract of land or onboard a foreign warship) cannot be found to be born "subject to the jurisdiction" of the United States within the meaning of the Fourteenth Amendment.

[12] It is well settled that stipulations of fact fairly entered into are controlling and

before the immigration judge.

The stipulation reflects that the "United States of America ... has totally refrained from exercising jurisdiction over the ... 'Horcon Tract' *since 1906.*" (Record at page 10) (underscoring supplied). This conclusion is well supported in the record. No United States official at Federal, State, or local level ever exercised any authority over the area; no laws of this country were ever enforced therein; no United States taxes were collected; no governmental services or benefits of any kind were provided; no obedience or allegiance to the United States by those born therein was demanded; and no "protection" by the United States Government was supplied.

Conversely, the parties have stipulated that the deaths and births (including the respondent's) of persons living within the Horcon Tract have been recorded on the Mexican Civil Registry[13]; that the laws of Mexico, including the laws of conscription, have been exercised within that area (the respondent himself complied with Mexico's conscription laws); that the roads and schools have been maintained by Mexican authorities; and, that the only police protection and other governmental services ever provided came from the Mexican Government.

It appears beyond question that since the transfer of the Horcon Tract to the southern side of the Rio Grande in 1906, no jurisdiction has been exercised therein by the United States. The respondent submits on appeal that the fact that this country maintained a port of entry only 300 yards from the Horcon Tract between 1929 and 1949 shows that it "had not abandoned a section of its national soil that happened to be south of the Rio Grande." The purpose of building that bridge, however, appears to have been related more to providing access to "prohibition speakeasies," than to evidencing any intent to exercise control over the tract. For even while the bridge was in existence and access to the tract was readily available, respondent admits that the United States continued to refuse to exercise any jurisdiction over that area.

This leads to the final question of why jurisdiction was withheld. Was it through mere neglect or was a conscious election made to waive jurisdiction because of the peculiar location of the tract? An answer to this question is found in the Secretary of State's Letter of Submittal to the President forwarding the "Boundary Treaty of 1970." After reviewing the origin of the Horcon Tract and the subsequent shifting

---

conclusive of the matters stipulated to therein. *See Fenix* v. *Finch,* 436 F.2d 831, 837 (8 Cir. 1971), and the cases cited therein; *C.J.S.* Stipulations, sec. 13.

[13] In this regard, it is noted that the respondent entered the United States in 1972 by presenting his "Nonresident Alien Mexican Border Crossing Card" (Form I-186). At the time he applied for and used that card (when 37 years old), the respondent apparently considered himself to be only a citizen of Mexico (See Form I-190).

of a Mexican village across the United States territorial line, the Secretary of State wrote:

In view of the exceptional origin and situation of the detached (tract), the United States at Federal, State, and local levels, has refrained from exercising jurisdiction over it.

The tract did not escape the notice of the United States from 1912 until 1970; instead, an intentional decision was made for political reasons not to exercise jurisdiction over the area. Although the majority appears troubled by this conclusion, it is not contested by the respondent as he submitted in his brief before the immigration judge that the "problem with jurisdiction in the Horcon Tract since 1906 has been the federal government's timidity in exercising its political jurisdiction over the... Tract for fear of causing an international incident." The respondent also submitted below that:

The United States has long known that the territory was American territory, but for fear of disturbing the international harmony with Mexico the federal government acquiesced to the entry of aliens and establishment of homes on the property and accepted the fact that a viable community existed on American soil.

Thus, the inescapable conclusion is that the United States, for foreign policy reasons, intentionally elected to except from its jurisdiction those few hundred acres of its territory which through unique circumstances came to fall on the southern side of the Rio Grande. This it had the legitimate sovereign power to do effectively. Therefore, when this respondent was born within that tract in 1935, he received no protection from the United States Government, owed this nation no obedience or allegiance, and was not in any manner "subject to the jurisdiction thereof."

In view of this final factual finding, I conclude that it has been established that the respondent acquired no jus soli citizenship by virtue of his birth in the Horcon Tract. Hence, I find that it has been established by clear, convincing, and unequivocal evidence that he is not a citizen of the United States and that he is deportable as charged. I would, therefore, dismiss the appeal. Moreover, as this is a matter of utmost importance, I believe the proceeding should be referred to the Attorney General for further review.

DISSENTING OPINION: Mary P. Maguire, Board Member

I concur in the foregoing dissenting opinion.

## BEFORE THE ATTORNEY GENERAL
(December 18, 1979)

This matter is before me for review pursuant to 8 C.F.R. section 3.1(h)(iii) upon a referral by the Board of Immigration Appeals at the request of the Immigration and Naturalization Service. The Board has sustained respondent's appeal from the decision of the immigration judge ordering him deported.

Respondent Homero Cantu-Trevino is an adult male who was admitted to the United States from Mexico in 1972 as an alien visitor. He has conceded remaining longer than authorized and, if an alien, is deportable under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(2).

Respondent was born on August 25, 1935, on a ranch in an area of 419 acres known as the "Horcon Tract" (the Tract) near the United States boundary with Mexico. He claims United States citizenship by virtue of his birth in that area, which was then territory of this country. His parents were natives of Mexico.[1]

The record in this matter is comprised principally of stipulations of fact presented by the Service and respondent, together with exhibits submitted by the latter. Following is a summary of the pertinent evidence.

Until 1906 the Tract was the southern half of a reverse-S meander of the Rio Grande River, the international boundary between the United States and Mexico, and was a contiguous part of Hidalgo County, Texas. The land within the northern part of the meander was then and has at all times remained Mexican territory. In 1906 an American irrigation company, acting for its own benefit, illegally changed the course of the Rio Grande by cutting a diversionary channel along a line that positioned the Tract on the Mexican side of the new course and ended the contiguity of the Tract with rest of Hidalgo County.

Although the American company's action violated a convention entered into by the United States and Mexico in 1884, it did not have the effect of changing the international boundary. The Tract continued to be American territory until the United States ceded it to Mexico in 1972, receiving in return an equal amount of acreage owned by Mexico north of the Rio Grande. This exchange and others were made in accordance with a treaty signed by the two countries on November 23, 1970, to resolve various pending boundary differences and

---

[1] Respondent acquired Mexican citizenship at birth, *Matter of Quintanilla-Montes,* 13 I&N Dec. 508 (BIA 1970). His possession of Mexican nationality does not affect his claim to nationality of the United States. *See Perkins* v. *Elg,* 307 U.S. 325, 329 (1939).

uncertainties.[2]

The parties to this matter stipulated that the United States "totally refrained from exercising jurisdiction" over the Tract after the diversion of the Rio Grande. Respondent's birth in 1935 was recorded in a Mexican civil registry office. When the time came, he complied with the Mexican conscription laws.

The town of Rio Rico, Tamaulipas, was established in 1929 in the northern or Mexican part of the original reverse S-curve of the river and from its founding was administered by Mexican officials. Because of erosion at its northern edge, Rio Rico gradually shifted southward and beginning October 1941, 6 years after respondent was born, crossed the former river bed so as to encroach on the Tract. A scholarly work written sometime after 1965[3] stated that the persons residing there in that year did not know of the true international boundary and that officials of Hidalgo County, Texas, were not aware the Tract belonged to the United States.

In a letter forwarding the Treaty of November 23, 1970, to the President for relay to the Senate, the Secretary of State informed him of the unlawful transfer of the Tract to the Mexican side of the Rio Grande and went on to say, "In view of the exceptional origin and situation of the detached tract, the United States, at Federal, State, and local levels, has refrained from exercising jurisdiction over it."[4] Article VI(B) of the Treaty provides that its transfers of the Tract and other areas "shall not affect in any way ... [t]he legal status with respect to the citizenship laws of those persons who are present or former residents of the portions of territory transferred."

Finally, the record in this proceeding contains no evidence that the United States expressly renounced or formally decided not to exercise jurisdiction of any kind over the Tract at any time before the respondent's birth.

The respondent's assertion of American nationality is based on the Citizenship Clause of the Fourteenth Amendment, which provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.[5]

The Service concedes that respondent was born in the United States for purposes of this clause. It denies, however, that he was born "subject to the jurisdiction" of the United States because this country

---

[2] Senate Ex. B, 92d Cong., 1st Sess., April 21, 1971; ratified November 29, 1971, 117 Cong. Rec. 43249.

[3] James A. Hill, *"El Horcon", the United States-Mexican Boundary Anomaly*, Rocky Mountain Social Science Journal.

[4] Senate Ex. B, *supra*, n. 2.

[5] The words "subject to the jurisdiction thereof" relate to the date of birth or naturalization. *Elk* v. *Wilkins*, 112 U.S. 94, 102 (1884).

did not exercise governmental authority in the Tract after 1906 and, so far as the record shows, did not resist the Mexican Government's exercise of such authority. In short, the Service contends there was a de facto waiver of jurisdiction before the respondent's birth. The immigration judge agreed and found that the respondent is not a citizen of the United States.

The Board of Immigration Appeals reversed the judge's decision. It pointed out that in a deportation proceeding the Service has the overall burden of proving its case by clear, unequivocal, and convincing evidence, *Woodby* v. *INS*, 385 U.S. 276 (1966), and is also required to provide the same measure of proof to establish the alienage of a citizenship claimant born in this country. *Nishikawa* v. *Dulles*, 356 U.S. 129, 133 (1958). Then the Board assumed for the purpose of argument that the United States could by "non-action" relinquish Fourteenth Amendment jurisdiction over a portion of its territory. It went on to find, however, that the Service had not produced the required quantum of proof that such jurisdiction in relation to the Tract had in fact passed from the United States to Mexico before the birth of the respondent. The Board accordingly terminated the deportation proceeding against him. It left "to some future date and some other process" a decision whether he is a United States citizen.

I concur in the Board's factual conclusion that the evidence on the issue it framed does not provide sufficient support for a holding that the United States by implication renounced or gave up its Fourteenth Amendment jurisdiction at a time fatal to the respondent's citizenship. However, I cannot join in the view of the Service and the assumption arguendo of the Board that this is a valid issue. More particularly, I cannot read the Citizenship Clause to permit in a case like this the severance of Fourteenth Amendment jurisdiction from territory in which the United States is the sovereign. Accordingly, I have concluded that respondent acquired citizenship of the United States at birth.

The starting point for the ascertainment of the correct approach in this matter is the landmark case of *United States* v. *Wong Kim Ark*, 169 U.S. 649 (1898), which held that the Fourteenth Amendment conferred citizenship on a child born in the United States to parents of Chinese descent who were resident aliens. The Court stated that the common law rule in this country both before and after it gained its independence was the English rule that any person born within the territory of a sovereign nation thereby acquired its citizenship. The purpose and effect of the Citizenship Clause, according to the Court, was in part to affirm this principle of jus soli in the Constitution. As it

Interim Decision #2748

stated, 169 U.S. at 693:

> The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke, in *Calvin's Case*, 7 Rep. 6a, 'strong enough to make a natural subject, for if he hath issue here, that issue is a natural born subject.'

The Court had earlier in its opinion, *id.* at 682, related the words "and subject to the Jurisdiction thereof" to the "exceptions or qualifications" referred to in the above passage:

> The real object of the Fourteenth Amendment of the Constitution, in qualifying the words, 'All persons born in the United States,' by the addition, 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words, (besides children of members of the Indian tribes, standing in a peculiar relation to the National Government, unknown to the common law,) the two classes of cases—children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State—both of which, as has already been shown, by the law of England, and by our own law, from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country.

These excerpts from *Wong Kim Ark* are consistent with the understanding of the draftsman of the Citizenship Clause, Senator Howard. He explained to the Senate:

> [It] is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors [sic] or foreign ministers accredited to the Government of the United States, but will include every other class of persons.[a]

---

[a] Cong. Globe, 39th Cong., 1st Sess., 2890, May 30, 1866. The words "subject to the jurisdiction thereof" were obviously the basis for Senator Howard's remarks concerning the exclusion of families of ambassadors and foreign ministers. In later remarks he assured the Senate that these words were also a means of excluding tribal Indians from citizenship by birth. *Id.*, 2890; 2895. *Elk* v. *Wilkins*, 112 U.S. 94 (1884), vindicated these assurances by holding that children born to such Indians did not acquire citizenship under the Fourteenth Amendment.

210

Judicial interpretation of the Citizenship Clause has uniformly adhered to *Wong Kim Ark. See* for example, *Perkins* v. *Elg*, 307 U.S. 325, 328-29 (1939); *Acosta* v. *Gaffney*, 413 F.Supp. 827, 830-831 (D. N.J. 1976), rev'd on other grounds, 558 F.2d 1153 (C.A. 3, 1977); *Regan* v. *King* 49 F.Supp. 222 (N.D. Calif. S.D., 1942), *aff'd*, 134 F.2d 413 (C.A. 9, 1943), *cert. den.*, 319 U.S. 753 (1943); and *see* Gordon and Rosenfield, *Immigration Law and Procedure*, section 12.5 (1979).

Thus there is no basis in the legislative history or judicial construction of the Citizenship Clause for the view that territory of which the United States is the sovereign can be deemed removed from its jurisdiction for purposes of the Citizenship Clause. Instead, it is the presence within and the personal relationship to the United States of a newborn child's parents that determines whether he was born "subject to the jurisdiction thereof" and without more became a citizen. Accordingly, since the birth of the respondent in this matter took place in the Horcon Tract before the United States transferred it to Mexico and since his parents did not fall within any of the exceptions to the rule of jus soli noted in *Wong Kim Ark*, he became a citizen at the moment of birth.

The Service has stated that if respondent acquired American nationality, he has never lost it. The immigration judge also found no basis for expatriation. The order of the Board terminating the deportation proceeding against the respondent is affirmed.